### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION


JEFFREY LEE GENTRY,

        Plaintiff,

     v.                                 Case No. C-1- 02-308

SUMMIT BEHAVIORAL
HEALTHCARE, et al.,

        Defendants.


### ORDER

This matter is before the Court upon defendants' motion for summary judgment (doc. 75), plaintiff's opposing memorandum (doc. 91), and defendants' reply (doc. 96). Also before the Court is plaintiff's motion for leave to file a memorandum in opposition to defendants' reply brief (doc. 98).

### I. Introduction

Plaintiff filed this action on May 2, 2002.  He invokes the Court's jurisdiction under Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112; Title II of the ADA, 42 U.S.C. § 12131, et seq.; the Rehabilitation Act, 29 U.S.C. §§ 701-794; and the Family and Medical Leave Act (FMLA).  Plaintiff also seeks to invoke the Court's supplemental jurisdiction over claims that he brings under Ohio law.

Plaintiff makes the following allegations in the complaint: Defendant Summit Behavioral

1

Healthcare (Summit) is a facility operating in Hamilton County, Ohio, which is owned by the State of Ohio. The facility serves the mentally and physically disabled. The individual defendants are employees of Summit, each of whom is alleged to have acted maliciously and outside the scope of his or her employment. Plaintiff is a Registered Nurse who began working at Summit on May 3, 1993. Plaintiff has Tourette's Syndrome and is disabled, or perceived by defendants to be disabled. Plaintiff was not treated differently because of his disability or his perceived disability until approximately May 25, 2000. Subsequent to that date, defendants have harassed him and retaliated against him on account of his disability or his perceived disability. Plaintiff was also reprimanded for an absence under the Family and Medical Leave Act (FMLA) in September of 2002.

Plaintiff claims that defendants violated Ohio public policy by discriminating against him because of his disability or perceived disability in violation of Ohio Rev. Code §§ 4112.02(A) and 4112.99 and the ADA; defendants violated plaintiff's rights under Ohio law when they refused to grant plaintiff safe working conditions and required him to put the Agency at risk by continuing to discriminate against him and retaliate against him for his complaints; defendants violated plaintiff's First Amendment rights under both the Ohio and federal constitutions when they retaliated against him for complaining regarding policies, supporting a fellow employee, and petitioning the Union and the State of Ohio through the State Employee Relations Board; defendants have violated the FMLA; and defendants discriminated against plaintiff in violation of Ohio Rev. Code § 4112.02(I) and (J) because plaintiff supported a fellow employee in her complaint and contested discrimination against himself.

## II. Summary judgment motion

2

Defendants move for summary judgment on all claims against them.  Defendants argue that (1) sovereign immunity bars plaintiff's ADA claims against the State; (2) plaintiff has failed to state a claim under Title II of the ADA; (3) the individual defendants are not liable under the ADA or the Rehabilitation Act; (4) plaintiff had no disability within the meaning of the ADA or the Rehabilitation Act; (5) plaintiff suffered no materially adverse employment action; (6) plaintiff's work environment was not an objectively hostile one because of any disability; (7) plaintiff's Title VII retaliation claim must be dismissed because plaintiff suffered no adverse employment action or hostile environment, his work environment was not objectively hostile because of any protected activity, and the individual defendants are not liable on that claim; (8) plaintiff's First Amendment claim must be dismissed because plaintiff's speech did not involve a matter of public concern, plaintiff did not suffer an adverse action that would deter a person of ordinary firmness from engaging in the speech in question, and plaintiff did not suffer an adverse action because of any speech on a matter of public concern; (9) the individual defendants are entitled to qualified immunity on plaintiff's claim under 42 U.S.C. § 1983; (10) the State of Ohio cannot be held liable on that claim; (11) plaintiff's FMLA claim based on his own serious medical condition is barred by sovereign immunity and the individual defendants are not liable on that claim; (12) sovereign immunity bars plaintiff's claims under Ohio law against the State of Ohio; and (13) plaintiff's state law claims against the individual defendants are barred by immunity under Ohio Rev. Code § 9.86.

3

### III. Undisputed facts

1. Defendant Summit, located in Hamilton County, Ohio, is a facility owned by the State of Ohio, Department of Mental Health (ODMH), which serves the mentally and physically disabled.

2. Defendant Malcolm King was Director of Nursing for Summit whose responsibilities included, among other things, oversight of the nursing staff, investigation of employee conduct for possible disciplinary action, and conducting hearings regarding employee discipline and grievances.

3. Defendant Savio Russo, Manager of Registered Nurses at Summit, issued a written reprimand to plaintiff on September 20, 2002, concerning a pattern of leave abuse for a series of absences, including a few absences that were allegedly necessary due to plaintiff's FMLA condition.

4. Defendant B.J. Burgs (formerly B.J. Maupin) is a Registered Nurse who, from time to time starting in August of 1999, has been the third-shift supervisor for plaintiff.

5. Plaintiff has been diagnosed with Tourette's Syndrome, which causes tics and involuntary muscle contractions.  Plaintiff's condition was mild and controlled by medication throughout most of his life.  The parties disagree as to whether plaintiff's condition causes him to have difficulty walking and speaking, whether he can drive, and whether he is emotionally stable and has no significant stress and anxiety.

4

6.      Plaintiff has been employed by ODMH as a registered nurse at Summit since May 3,

        1993.  During his initial interview for a position at Summit, plaintiff revealed that he has

        Tourette's Syndrome but did not indicate that any particular accommodation would be

        necessary.

7.      Plaintiff's position with ODMH is a bargaining unit position.

8.      During his employment, plaintiff has worked predominately the third-shift.

9.      Essential functions of plaintiff's nursing position at ODMH include accurately

        completing patient documentation and departmental paperwork and assuring the safety of

        his assigned unit.  The parties disagree as to whether the administration of injections to

        patients is an essential function of plaintiff's nursing position.

10.     Plaintiff received satisfactory performance reviews for the first seven years of his

        employment at Summit.

11.     In July of 2000, as part of plaintiff's annual review, Burgs rated plaintiff "below

        expectation" in the areas of "problem solving/decision making" and "communication."

12.     From August 2000 through April 2001, plaintiff wrote letters complaining of his 2000

        performance evaluation to various individuals employed by ODMH and to others.

13.     In September of 2000, Jo Anne Sessions became plaintiff's supervisor.

14.    In May of 2001, Summit employee Linda Higgenbotham filed a charge of discrimination based on her Appalachian ancestry with the Ohio Civil Rights Commission (OCRC). Plaintiff accompanied her during some part of this process.

15.    Burgs was aware that Higgenbotham had filed the charge with the OCRC.

16.    In July of 2001, defendant King approached plaintiff in an effort to ascertain plaintiff's ability to administer injections.  Plaintiff invited King to observe his ability to administer injections.

17.    At some point, plaintiff obtained FMLA certification of his Tourette's Syndrome condition, including the necessity of intermittent leave.

18.    On October 11, 2001, plaintiff filed a charge of discrimination with the OCRC and with the Equal Employment Opportunity Commission (EEOC) against Summit and the other named defendants, claiming that he was being discriminated against and retaliated against due to his Tourette's Syndrome.

19.    On January 28, 2002, plaintiff filed an amended affidavit with the EEOC, charging that he was being discriminated against and retaliated against for assisting and/or supporting Higgenbotham in filing a charge of discrimination.

20.    In September of 2002, plaintiff received a Letter of Reprimand for "pattern abuse" of sick leave.

21.    Plaintiff continued to use FMLA leave after receiving the Letter of Reprimand in September of 2002.

22.    Plaintiff was approved for extended disability leave in October of 2002, and he has not returned to work at Summit since.

6

23.     Plaintiff has never been demoted from his position as a nurse with Summit. The parties

dispute whether plaintiff has suffered a reduction in pay or a reduction in job

responsibilities and whether he was ever denied leave for a certified FMLA condition.

### IV. Preliminary matters

### A. Oral argument

The Court finds that oral argument is not necessary in this case. The legal and factual

issues involved in the case are not complex and they have been fully briefed by the parties.

Pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Southern

District of Ohio, the matter will therefore be decided based upon the parties' memoranda.

### B. Supplemental memorandum

Plaintiff moves the Court for leave to file a supplemental memorandum regarding issues

other than those previously submitted in accordance with Fed. R. Civ. P. 56. The Court will

grant plaintiff's motion and will consider the memorandum in ruling on the summary judgment

motion.

### C. Documentary evidence

In their reply brief, defendants claim that plaintiff has improperly submitted volumes of

documents in support of his opposing memorandum that are outside the scope of Fed. R. Civ. P.

56(c) and should not be considered by the Court. Defendants allege that nearly all of the 88

documents submitted by plaintiff are hearsay and much of the evidence appears to be statements,

correspondence, and documents that are not incorporated into the record by a sworn affidavit.

In response, plaintiff contends that at least twelve of the documents that he has submitted

are cited by defendants as exhibits in their motion for summary judgment; at least thirty of the

7

documents were attached to plaintiff's joint pre-trial order and were not objected to by defendants; at least five of the documents are attached to the joint pre-trial order and are cited by defendants; and several of the documents are admitted in defendants' depositions.

Defendant has not specified the particular items of evidence that purportedly contain hearsay or the specific statements or documents that have not been incorporated into the record by a sworn affidavit. It is not the Court's responsibility to comb through the evidence to determine which items are deficient in these respects. Accordingly, in resolving the summary judgment motion, the Court will not exclude from consideration any of the evidence on which plaintiff relies unless the evidence is immaterial.

### V. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no

8

genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* at 249 (citing *Cities Serv.*,  391 U.S. at 288-289).  If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted.  *Anderson*, 477 U.S. at 249.

## VI.  Opinion

### A. ADA/Rehabilitation Act claims against the individual defendants

Plaintiff brings a hostile environment claim under both the ADA and the Rehabilitation Act.  Plaintiff concedes that individual supervisors may not be held personally liable for violations of the ADA, so that his claims under Title I and Title II of the ADA against the individual defendants in their individual capacities are barred.  *See Sullivan v. River Valley School Dist.,* 197 F.3d 804, 808 n. 1 (6th Cir. 1999).  Plaintiff likewise concedes that the individual defendants are not liable under the Rehabilitation Act.  The individual defendants are therefore entitled to summary judgment on that claim.

### B. Title II claim against Summit

Defendant Summit contends that plaintiff has failed to state a claim against it under Title II of the ADA because Title I is the exclusive remedy for claims of employment discrimination under the ADA.  Plaintiff asserts that he may pursue a claim for money damages for denial of his due process rights against Summit under Title II of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

9

42 U.S.C.A. § 12132. In *Bd. of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356

(2001), the Supreme Court expressly declined to determine whether an individual may sue his

state employer for damages under Title II of the ADA. The Sixth Circuit subsequently held that

Title II may validly abrogate sovereign immunity in certain cases where it is used to enforce due

process rather than equal protection guarantees. *Popovich v. Cuyahoga County Court of*

*Common Pleas,* 276 F.3d 808, 813, 815-16 (6th Cir. 2002) (en banc)). The Sixth Circuit has

stressed that the essential holding in *Popovich* is that a Title II claim sounds in due process and

abrogates sovereign immunity where the plaintiff alleges that he was excluded from participation

in a proceeding guaranteed by the Due Process Clause because of his disability. *Robinson v.*

*University of Akron School of Law,* 307 F.3d 409, 413 (6th Cir. 2002). Based on these

decisions, it appears that plaintiff may pursue a Title II claim against Summit insofar as plaintiff

claims that he was denied his due process rights on account of his disability.

In support of his claim that he was denied his due process rights in violation of Title II,

plaintiff alleges that Burgs failed to follow established procedures when she gave plaintiff a

negative performance evaluation in June of 2002.[1] (Plaintiff's memo in opp. to motion for

summary judgment, p. 17). Plaintiff also alleges that defendants failed to provide him with a

hearing under his Union contract and defendant's policies and procedures and that Summit's

CEO retaliated against him by issuing a reprimand to him when he complained about the failure

---

[1] This date appears to be incorrect. According to plaintiff's statement of facts, Burgs completed plaintiff's evaluation in June of 2000 and Russo completed plaintiff's evaluation in July of 2002. (See plaintiff's memo in opp. to motion for summary judgment, pp. 3, 14). Plaintiff alleges in his statement of facts that Burgs did not follow proper procedures in completing his June 2000 evaluation because she did not discuss with plaintiff his pre-evaluation prior to the actual performance review, she did not follow established procedures in addressing and distributing the evaluation, and she requested that plaintiff sign the document prior to the review and signatures of the Director of Nursing and the Chief Executive Officer.

to follow procedures.

Accepting plaintiff's allegations as true, the Court finds that plaintiff may not pursue a claim under Title II of the ADA. Plaintiff generally alleges in the amended complaint that defendants discriminated against him because of his disability or perceived disability in violation of the ADA and that the Court has jurisdiction over his claims filed under Title II of the ADA because a public entity discriminated against him. Plaintiff, however, makes no allegations in the amended complaint that would support a claim that defendants violated his due process rights. Even if plaintiff had pled such a claim, he is not entitled to pursue the claim. In his brief in

opposition to defendants' summary judgment motion, plaintiff indicates that his due process claim arises from defendants' failure to follow certain procedures with respect to a performance review. Plaintiff, however, has not shown that he had any due process rights in connection with a routine performance review. Nor has plaintiff come forward with evidence that shows that the alleged failure to follow procedures was based on his disability. Accordingly, Summit is entitled to summary judgment on plaintiff's claim under Title II of the ADA.

**C. Title I/Rehabilitation Act claim v. Summit**

Defendant Summit concedes that sovereign immunity does not bar plaintiff's claim against it under the Rehabilitation Act to the extent that such claim has been waived by the receipt of federal funds. ***See Nihiser v. Ohio E.P.A.,*** 269 F.3d 626 (6th Cir. 2001). Accordingly, Summit is not entitled to summary judgment on the ground of sovereign immunity with respect to this claim.

Defendants correctly note that the State and its agencies are entitled to sovereign

immunity on claims brought under Title I of the ADA.  *See Garrett,* 531 U.S. 356.  However, sovereign immunity does not bar claims for injunctive relief brought by private individuals against a state.  *Id.* at 374 n.9 (citing *Ex Parte Young,* 209 U.S. 123 (1908)).  Accordingly, plaintiff's claim for injunctive relief against Summit under Title I of the ADA is not barred under the doctrine of sovereign immunity, and the Court will examine whether plaintiff has come forward with sufficient evidence to create a genuine issue of material fact with respect to his claim against Summit under the Rehabilitation Act and under Title I of the ADA.

**i. Applicable law**

Plaintiff claims that he was subjected to a hostile environment on account of his disability in violation of both the ADA and the Rehabilitation Act.  The ADA prohibits an employer from discriminating against a "qualified individual with a disability" because of that individual's disability.  42 U.S.C. § 12112(a). The Rehabilitation Act provides that "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a). A claim brought under the Rehabilitation Act may be analyzed in the same manner as a claim brought under the ADA. *Thompson v. Williamson County, Tennessee,* 219 F.3d 555, 557 n. 3 (6th Cir. 2000)(citing *Maddox v. University of Tennessee,* 62 F.3d 843, 846 n.2 (6th Cir. 1995)).

To prevail on a claim of disability-based harassment, plaintiff must prove that (1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his disability, (4) the harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive, or intimidating work environment, and (5)

12

there is employer liability. *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999).

In determining whether an individual is disabled so as to satisfy the first prong of a hostile environment claim under the ADA, an individualized inquiry must be made and measures that mitigate an individual's impairment must be taken into account. *Cotter v. Ajilon Servs., Inc.,* 287 F.3d 593, 598 (6th Cir. 2002)(citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999)). An individual is considered "disabled" under the ADA if he:

> (A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) [has] a record of such an impairment; or
> (C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).

An individual may be regarded as disabled if "(1) a covered entity mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton,* 527 U.S. at 489. "This part of the Act is intended to allow individuals to be judged according to their actual capacities, rather than through a scrim of 'myths, fears, and stereotypes' accruing around a perceived impairment." *Mahon v. Crowell,* 295 F.3d 585, 592 (6th Cir. 2002)(citing *Sutton,* 527 U.S. at 489-90).

The regulations accompanying the ADA define a "physical or mental impairment" as,

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 CFR § 1630.2(h).

The term  "substantially limits" is defined to mean,

(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 CFR § 1630.2(j)(1).

The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

29 C.F.R. § 1630.2(i).  The regulations set forth the following factors to be considered in determining whether an individual is  "substantially limited" in a major life activity:

(i) The nature and severity of the [claimant's] impairment;
(ii) The duration or expected duration of the impairment; and
(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

The Supreme Court has determined that the terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled."

***Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,*** 534 U.S. 184, 197 (2002). Any

14

impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. *Mahon,* 295 F.3d at 590-91.

To satisfy the fourth prong of a disability-based harassment claim, plaintiff must show that the conduct to which he was subjected was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and that he subjectively regarded the conduct as abusive. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000)(citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 658-59 (6th Cir. 1999)). In determining whether a reasonable person would consider an environment hostile or abusive, a court must consider all of the circumstances, including the frequency and severity of the conduct and whether the conduct is threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. *Hafford,* 183 F.3d at 512.

Employer liability for co-worker harassment is based directly on the employer's conduct. *Id.* (citing *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 n. 11 (6th Cir. 1994)). An employer is liable if it "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Id.* Employer liability for supervisor

harassment is vicarious. *Id.* (citing *Pierce*, 40 F.3d at 803). As the Supreme Court has explained:

> An employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. at 775, 807 (1998)).

**ii. Resolution of hostile environment claim**

The parties dispute whether plaintiff had a disability during the relevant time period so as to satisfy the first element of his hostile environment claim. Plaintiff claims that he is disabled because his Tourette's Syndrome substantially limits a major life activity. Plaintiff summarizes the limitations imposed by his condition as follows:

> Gentry has always had intermittent difficulty speaking, walking and bathing. He has never been able to participate in team sports. While at home or work, it was necessary for Gentry to spend time by himself for at least five minutes in order to release the neurological tics from his body. On a daily basis, Gentry required substantially more time to dress, shower, shave and get ready for work than the average person. (Gentry Affidavit, Exhibit 28). Gentry is over 40-years of age and has always resided with his parents. (Gentry Deposition, Pages 39, 240). After the harassment started in 1999, Gentry, for the most part, stayed at home while not working. He also fell on occasion at home when his tics started getting worse. (Gentry Deposition, Page 45). These activities[,] which limited his ability to care for himself and clearly affected his daily life, did not affect his ability to perform the essential functions of his job.

(Doc. 91, Memo. in opp. to motion for summary judgment, pp. 20-21). In his affidavit, plaintiff states that prior to 1999 and 2000, he generally would take at least an hour to get ready for work. Plaintiff also claims that his taking five-minute breaks to release all of the tics from his body did not occur when he needed to concentrate in a one-on-one situation or when he was giving

injections, and that he was always able to perform the essential functions of his job. Plaintiff alleges that after defendants began harassing him, his tics became worse, he was uncomfortable going out to eat or out in public, and he stopped going to public places, restaurants, and movie theaters. Plaintiff claims that his limitations with respect to walking, showering, shaving, and his need to allow his tics time to subside before he can engage in many activities, cumulatively impair him to a substantial degree.

The Court has reviewed the evidence of record, including plaintiff's affidavit.[2] The Court finds that plaintiff has not come forward with sufficient evidence to create a genuine issue of material fact as to whether plaintiff was disabled during the period of the alleged harassment. It is undisputed that plaintiff has an impairment, Tourette's Syndrome, but the evidence does not show that his impairment substantially limited a major life activity during the relevant time period. Plaintiff's allegations do not establish that he was unable to perform a major life activity as that term is defined in the regulations. Nor has plaintiff shown that he was significantly restricted as to the condition, manner, or duration under which he could perform a major life activity as compared to the average person in the general population. A fact-finder could not reasonably determine that taking an hour to prepare oneself for the work day is a substantial limitation on the major life activity of caring for oneself. In addition, plaintiff has not shown how either the need to take occasional five-minute breaks due to his condition or occasional falls substantially limited any major life activity. Moreover, although plaintiff alleges that he had intermittent difficulty speaking, walking and bathing, his bare allegation to this effect does not permit a finding that he was significantly restricted in these activities. Finally, although plaintiff

---

[2] Plaintiff's deposition has not been filed with the Court and is not part of the record.

17

alleges that he stopped going to public places, restaurants, and theaters after his tics became worse, plaintiff maintains that he was able to continue working despite the worsening of his condition. Thus, his alleged difficulty in venturing out to public places cannot reasonably be said to have affected a major life activity as defined by the ADA and the accompanying regulations.

Plaintiff claims that the evidence also supports a finding that Summit regarded him as having an impairment that substantially limited one or more of his major life activities, specifically the performance of manual tasks. As evidence to support this theory of disability, plaintiff contends that defendant Burgs commented to several employees about her concerns regarding plaintiff's ability to give injections, and she required him to take an injection test to prove his ability to do so. Plaintiff also contends that defendants repeatedly chastised him regarding his penmanship, and defendant Burgs told another employee that she believed that plaintiff could not perform a task known as "the CARDEX requirements" because of the movements caused by his tics.

Plaintiff's allegations are not sufficient to support a finding that Summit perceived him to be substantially limited in the major life activity of performing manual tasks. Plaintiff indicates that, at most, his supervisors questioned his penmanship and his ability to perform one or two job-related tasks. Assuming Summit believed plaintiff to be unable to perform such tasks, plaintiff's alleged inability to perform a few isolated, job-related duties does not constitute a substantial limitation on his ability to perform manual tasks. The evidence does not support a finding that defendants perceived plaintiff to be substantially limited in any other major life activity. Accordingly, because a reasonable fact-finder could not infer that plaintiff was a

18

disabled individual during the relevant time period either because he was substantially limited in a major life activity or because Summit perceived him to be so, plaintiff cannot establish the first essential element of his hostile environment claim.

Second, plaintiff cannot establish that he was subjected to conduct that was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive.  In support of his hostile environment claim, plaintiff has submitted the affidavits of Summit employees who set forth derogatory comments that were purportedly made about plaintiff and the tics caused by his Tourette's Syndrome, as well as incidents where supervisory personnel mocked plaintiff's tics, but apparently those comments and incidents occurred outside of plaintiff's presence and were not relayed to him.  Some affiants state that they observed that Burgs treated plaintiff differently than other employees and they characterized Burgs' treatment of plaintiff as badgering and harassing, but they provide no specifics that would show the severity or frequency of the harassment and indicate whether the alleged incidents of badgering and harassment were based on plaintiff's Tourette's Syndrome.  In his own affidavit, plaintiff complains generally about harassment and about certain specific supervisory actions but, accepting his allegations as true, those actions cannot reasonably be construed as severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive.  Beyond his affidavit, plaintiff alleges that Burgs made a direct comment to him about his tics, stating, "Can't you take something to stop all the jumping and bouncing around?" Burgs' comment can be characterized as insensitive and offensive, but it is not enough, when considered with the remaining evidence, to establish a hostile environment claim.  Plaintiff also asserts that defendant King made derogatory comments about plaintiff's movements.  In support

19

of his contention, plaintiff refers the Court to doc. 76, exh. 5, in which plaintiff states that following a meeting on July 30, 2001, King, in his capacity as Director of Nursing, asked plaintiff "a series of probing questions regarding what [King] termed as [plaintiff's] movements."  There is no indication, however, that King's questions regarding plaintiff's "movements" were derogatory or objectively offensive. For these reasons, defendants are entitled to summary judgment on plaintiff's hostile environment claim.

**D. Retaliation claims under Title VII against the individual defendants**

Plaintiff brings retaliation claims against all of the defendants under Title VII.  Plaintiff concedes that supervisors are not included within the definition of "employer" under Title VII and therefore cannot be held personally liable for discrimination under the statute.  ***See Wathen v. General Electric Co.,*** 115 F.3d 400, 404-05 (6th Cir. 1997).  Accordingly, the individual defendants are entitled to summary judgment insofar as plaintiff sues them in their individual capacities.

**E. Title VII claim against Summit**

Title VII, 42 U.S.C. § 2000e-3(a), makes it an unlawful employment practice for an employer to discriminate against an employee because the employee has opposed an employment practice made unlawful by that subchapter or "because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that subchapter.  To prove a claim of retaliation under § 2000e-3(a), the plaintiff must demonstrate that (1) he engaged in protected activity; (2) the exercise of his civil rights was known by the defendant; (3) the defendant thereafter took adverse employment action or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) a

20

causal connection exists between the protected activity and the adverse employment action or the harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir.2000).

To establish a causal connection, plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken, or plaintiff would not have been subjected to the alleged harassment, had the plaintiff not engaged in the protected activity. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).  Evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action or harassment occurred shortly after the plaintiff's exercise of protected rights is relevant to causation. *Id.*  "[I]n certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004).

In order to establish an "adverse employment action," the plaintiff must show "a materially adverse change in the terms and conditions of his employment." *Hollins v. Atlantic Company,* 188 F.3d 652, 662 (6th Cir. 1999).

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir. 1993)).

Plaintiff identifies the allegedly protected activity in which he engaged as follows:

- Prior to the filing of his EEOC charge, plaintiff complained numerous times about First Amendment issues and discriminatory treatment.

- Plaintiff supported co-worker Linda Higginbotham in the filing of her May 2001 EEOC charge.

- Plaintiff filed his own EEOC charge on October 11, 2001.

- Plaintiff accompanied witnesses Nancy Jewell and Sandy Hockmeyer when they were interviewed by the OCRC in February of 2002.

The complaints to supervisory employees to which plaintiff refers are set forth in various exhibits and include a letter to Liz Banks, CEO, wherein plaintiff relayed concerns about being removed from the units and the patients assigned to him in order to meet with her, thereby purportedly compromising his ability to effectively carry out his duties; concerns about being required to count medications alone at shift change in violation of hospital policy and state and federal guidelines; and concerns about being assigned the responsibility of additional units and patients two to three hours after his tour of duty had begun, thereby allegedly compromising his ability to effectively carry out his nursing duties and putting patients' safety at risk (exh. 52); a letter to Burgs expressing plaintiff's concern about her meeting with him while he is on shift (exh. 81); and letters to Savio Russo from plaintiff asking for input about what to do in a situation where Burgs had received complaints that documents were not in order, but Sessions had found that documents were as they should be (exh. 82), inquiring what to do about Burgs' complaint that pages from charts were falling out, when she declined to check patients' charts while on the unit (exh. 83), and asking if plaintiff could leave patient progress notes in the mid-room (exh. 85).

The complaints plaintiff has set forth do not, as a matter of law, constitute protected

22

activity.  The complaints concern issues that plaintiff raised concerning his supervisors'
performance of their job duties and how plaintiff believed their actions negatively impacted his
ability to effectively perform his job.  The complaints do not convey that plaintiff believed that
he was being treated differently than other employees for any reason, and more particularly for a
reason prohibited by the anti-discrimination statutes, or that he was being harassed because of
his alleged disability or for any other reason.

On the other hand, plaintiff's filing of his own EEOC charge is protected activity, and his
"support" of other employees who filed discrimination charges may conceivably constitute
protected activity, so that the Court finds for purposes of the summary judgment motion that
plaintiff has satisfied the first element of a retaliation claim by virtue of his activity related to the
filing and pursuit of EEOC charges.  As to the requirement that the exercise of his civil rights be
known to defendants, plaintiff does not allege that any defendant or supervisory employee knew
of the filing of his own charge in October 2001 during the relevant time period.  Plaintiff does
allege, however, that defendants Burgs and King knew of plaintiff's support of Higginbotham.
Accordingly, the Court finds for purposes of the summary judgment motion that there is a
genuine issue of fact on the second element of his retaliation claim.  The Court will therefore
consider whether plaintiff has come forward with sufficient evidence to satisfy the adverse
action or harassment and causal connection requirements.

Plaintiff identifies the alleged retaliatory actions to which he was subjected as follows:

- In June of 2001, after Higginbotham had filed her charge, Burgs left Gentry with
  two patients in one-on-one situations with only two other staff on his unit in
  violation of safety regulations.

- In June of 2001, Burgs asked plaintiff, "Can't you take something to stop all that
  jumping and bouncing around?"

23

- Burgs continued to harass plaintiff about doing his job but gave him no specifics.

- After Higginbotham's charge of discrimination in early 2001, Burgs refused to offer overtime to plaintiff, as opposed to Supervisor Jo Anne Sessions, who offered plaintiff overtime on several occasions in July of 2001.

- Burgs refused to allow plaintiff or his staff to use the conference room in September of 2001.

- Burgs threatened plaintiff that she would terminate him if he would not falsify documents for her.

- Burgs required plaintiff to count medication alone, and when plaintiff informed Burgs that he would write on the report that he had done the count alone and it was off, Burgs removed plaintiff's report, made out a new report, and threatened plaintiff with termination.

- Burgs refused to allow plaintiff to obtain medication from another unit but did not prevent other nurses from doing this.

- Burgs passed out paychecks to other employees but required plaintiff to come to her office to get his.

- Burgs would not sign plaintiff's shift reports when the top section was not complete, but she would do so for other employees.

- Burgs told plaintiff that if he challenged her authority, she would write him up and terminate him.

- Burgs required plaintiff to falsify documentation but required another employee to fill out forms for an "absent TPW."

- Burgs refused to allow plaintiff to orientate new staff, "which was part of his performance evaluation."

- Burgs would not answer plaintiff's pages or his phone calls, and she refused to communicate after his complaint.

- Burgs refused to give plaintiff documentation supporting his evaluation, but she gave others documentation to support their evaluations.

24

- On March 28, 2002, plaintiff was left alone on his unit after he had  "supported Linda Higgenbotham's witnesses", i.e., after Burg saw plaintiff accompany Nancy Jewell and Sandy Hockmeyer when they were speaking to Ms. Hollis of the OCRC.

- In April of 2002, Burgs short-staffed plaintiff's unit, but similarly-situated employees supervised by Burgs were not left alone on units without adequate staffing.

- In March and April of 2002, Burgs came to plaintiff's unit and ordered him to move chairs and to sign a memo while plaintiff was in a one-on-one situation and under physician's orders to remain in eye contact with the patient, whereas other employees were not interrupted when they were with a patient in a one-on-one situation.

- In May of 2002, Burgs left a unit that she had assigned to plaintiff with only one staff member.

Plaintiff claims that King retaliated against him in the following respects:

- King refused to communicate with plaintiff in June of 2001 when plaintiff wrote him a letter regarding plaintiff's poor evaluation by Burgs.

- King ordered plaintiff to do nine injection tests.

- King refused to investigate or act on plaintiff's specific complaints to him about Burgs' failure to adequately staff plaintiff's shifts.

- King did not speak with Burgs about plaintiff's complaints because Burgs was already copied with the complaints.

- King refused to address plaintiff's discrimination grievance, which was part of King's responsibilities.

- King refused plaintiff administrative leave.

- Kings refused a continuance to plaintiff at a proposed disciplinary conference and would not allow him to have a Union delegate at his grievance.

Defendant Russo allegedly retaliated against plaintiff by:

- Ordering plaintiff to re-do a glucometer list on August 1, 2001, in violation of the Ohio Administrative Code.

25

- Reprimanding plaintiff because he had spoken with counsel regarding his inability to use the conference room on Unit 6.

- Setting plaintiff up for termination by forging plaintiff's name on a glucometer list.

- Giving plaintiff a poor evaluation in the summer of 2002 and refusing to give plaintiff supporting documentation.

- Giving plaintiff written discipline in September of 2002 for calling off while on FMLA leave.

- Disciplining plaintiff for not signing his evaluation when the evaluation had not been completed or presented by Russo.

- Refusing plaintiff a witness when issuing a reprimand.

- Issuing a reprimand to plaintiff for an alleged "call off" pattern.

While plaintiff has amassed a long litany of complaints, the Court finds as a matter of law that the actions of which he complains cannot properly be construed separately or collectively as an adverse employment action sufficient to support a retaliation claim. The complaints largely concern everyday administrative decisions or actions with which plaintiff disagreed and which clearly did not result in a decrease in wages or salary, a material loss of benefits, significantly diminished job responsibilities, or any other materially adverse change in the terms or conditions of plaintiff's employment. The closest plaintiff comes to alleging an action that may have had a negative impact on his earnings or benefits is his contention that Burgs refused to offer him overtime after Higginbotham's charge of discrimination in early 2001. Plaintiff has not, however, produced any evidence to explain the circumstances surrounding the denial of overtime or to establish that Burg's refusal to offer him overtime adversely impacted his earnings to any appreciable extent. Plaintiff also alleges that he received certain written disciplinary action, but

26

he has not shown how the written discipline adversely impacted his job situation in any respect.

As to plaintiff's claim that he was harassed in retaliation for engaging in protected activity, the Court will assume for purposes of the summary judgment motion that at least some of the actions that form the basis for plaintiff's retaliation claim were taken for purposes of harassing plaintiff rather than for a legitimate business reason. Proceeding on that assumption, the Court nonetheless finds that plaintiff has failed to produce sufficient evidence to proceed on his Title VII claim because he has not come forward with evidence to show that the harassment of which he complains was causally related to his protected activity. Temporal proximity alone is not enough to establish a causal connection under the circumstances of this case for several reasons. First, plaintiff has failed to provide a time frame for many of the alleged retaliatory actions. Second, the myriad of retaliatory actions for which plaintiff has alleged specific dates occurred both before either plaintiff or Higginbotham had filed their EEOC charges and after one or both of them had filed their charges. Third, because the only individuals specifically alleged to have known of plaintiff's support of Higginbotham were King and Burgs, actions taken by Russo or other individuals cannot reasonably be linked to plaintiff's supporting Higginbotham, regardless of the temporal proximity between plaintiff's support of Higinbotham and those actions. There is a complete absence of any other evidence to show a causal link between plaintiff's protected activity and the retaliatory harassment he alleges. Accordingly, plaintiff is not entitled to proceed to trial on his Title VII retaliation claim.

27

**F. First Amendment claim under § 1983**

Plaintiff brings his First Amendment claim against the individual defendants. Plaintiff alleges that each of them is liable in his or her individual capacity and should be held liable for injunctive relief in his or her official capacity. Although plaintiff asserts that he also brings the First Amendment claim against defendant Summit based on the actions of its Director Elizabeth Banks, plaintiff concedes that the State cannot be held liable for damages on his § 1983 claim, and he does not indicate that he wishes to pursue a claim for injunctive relief against Summit for the alleged First Amendment violation. Accordingly, the Court will determine whether plaintiff has come forward with sufficient evidence to raise a genuine issue of material fact on his First Amendment claim against only the individual defendants.

Plaintiff's argument in support of his First Amendment claim is difficult to follow. Plaintiff apparently alleges that he engaged in protected speech when he made complaints to defendants King and Banks, Summit Human Resources Manager Rhonda Milton, and various agencies regarding the unfavorable evaluation that he had received from Burgs and regarding Burgs' actions toward him and her continuing disparate treatment of him due to his perceived disability. Plaintiff argues that although his complaints were personal, employee complaints, they raise public issues because Burgs' evaluation did not comply with the policies outlined by the State of Ohio.

Plaintiff further claims that defendants violated his First Amendment rights by retaliating against him for not following the chain of command, by reprimanding him for complaining to the Department of Mental Health that he was denied due process, and by refusing to respond to his complaints. Plaintiff claims that he suffered several retaliatory employment actions, which

28

include a reprimand that affected his ability to be promoted or transferred; denial of overtime; denial of a hearing regarding his performance review; failure to meet with him to discuss the harassment by Burgs; refusal to accept certified mail or written complaints and to pass these documents on to individuals at Summit who were required to investigate plaintiff's complaints; requiring plaintiff to re-do a glucometer list; denying plaintiff and his staff access to policies and other information in the conference room; leaving plaintiff in a dangerous one-on-one situation at least twice; refusing to given plaintiff the right to staff orientation; and harassing plaintiff because of his disability.  Plaintiff claims that the actions taken against him led to his disability.

Defendants argue that plaintiff's First Amendment claim must be dismissed because plaintiff's speech did not touch on a matter of public concern, plaintiff suffered no adverse action that would deter a person of ordinary firmness from engaging in the speech in question, and there is no conceivable nexus between any protected speech and any action taken with regard to plaintiff.  In addition, the individual defendants claim that they are entitled to qualified immunity from suits for damages.

Government officials performing discretionary functions are generally immune from liability for civil damages so long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). That is, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* "If officials of reasonable competence objectively could disagree on the law, immunity should be recognized." *Cameron v. Seitz,* 38 F.3d 264, 272 (6th Cir. 1994)(citing

*Mumford v. Zieba,* 4 F.3d 429, 432 (6th Cir. 1993)).

A public employee who seeks to establish a First Amendment violation based on an adverse employment action against him must demonstrate that his speech was constitutionally protected and that such speech was a substantial or motivating factor in the adverse employment decision. *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir. 1999)(citing *Bd. of County Commissioners, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668, 675 (1996)). If the employee establishes a First Amendment violation, the government can avoid liability "by showing that it would have taken the same action even in the absence of the protected conduct." *Id.*

In determining whether speech is constitutionally protected, the Court must first determine whether the plaintiff's speech may be fairly characterized as constituting speech on a matter of public concern. *Rahn v. Drake Center, Inc.,* 31 F.3d 407, 411 (6th Cir. 1994). A matter of public concern generally involves a matter of political, social, or other concern to the community. *Leighton,* 168 F.3d at 909 (citing *Connick v. Myers,* 461 U.S. 138, 146 (1983)). A determination of whether speech involves a matter of public concern must be based on the "content, form, and context of a given statement, as revealed by the whole record." *Jackson v. City of Columbus,* 194 F.3d 737, 746 (6th Cir. 1999)(quoting *Connick,* 461 U.S. at 147-48)). The entire speech of the employee does not have to address matters of public concern. It is only necessary that some portion of the speech do so in order to qualify as protected speech. *Rahn,* 31 F.3d at 412 (citing *Connick,* 461 U.S. at 149). Moreover, speech on matters of public concern need not be communicated to the public in order to be entitled to constitutional protection. *Chappel v. Montgomery County Fire Protection District No. 1,* 131 F.3d 564, 579 (6th Cir. 1997). The

30

motive underlying an employee's statement is a relevant but not necessarily dispositive factor in considering whether the statement may be fairly characterized as relating to a matter of political, social, or other concern to the community. *Id.* at 576 (citing *Cliff v. Board of Sch. Comm'rs of Indianapolis, Indiana,* 42 F.3d 403, 409 (7th Cir. 1994)).

Matters of public concern must be distinguished from internal office politics that are simply matters of personal interest. *Leighton,* 168 F.3d at 909. "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Id.* at 911 (citing *Connick,* 461 U.S. at 149). Federal courts ordinarily do not review personnel decisions made in response to an employee's behavior "when a pubic employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *City of Columbus,* 194 F.3d at 746 (quoting *Connick,* 461 U.S. at 147). "'[I]nternal personnel disputes or complaints about an employer's performance' do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech." *Rodgers v. Banks,* 344 F.3d 587, 596 (6th Cir. 2003)(citing *Brandenburg v. Housing Authority of Irvine,* 253 F.3d 891, 898 (6th Cir. 2001)). "[T]he quintessential employee beef: management has acted incompetently" without any evidence linking that complaint to corruption is not a matter of public concern. *Rahn,* 31 F.3d at 414. Conversely, the public interest is implicated when "'ensuring that public organizations are being operated in accordance with the law,' when 'expos[ing] graft and corruption,' and when 'seeing that public funds are not purloined' or wasted." *Chappel,* 131 F.3d at 576 (citing *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir. 1986)).

Whether speech constitutes a matter of public concern is a question of law for the Court.

31

*Rahn,* 31 F.3d at 411. If the speech does not address a matter of public concern, no further

inquiry is necessary. *Id.* If any part of the speech relates to matters of public concern, the

balancing of interests test set forth in *Pickering v. Bd. of Education,* 391 U.S. 563 (1968), must

be applied to determine whether plaintiff's interest in speaking outweighed the defendant's

interest in promoting the efficiency of the public services it performs. *Id.* This inquiry is a factual

determination *(Bonnell v. Lorenzo,* 241 F.3d 800, 810 (6th Cir. 2001)), which requires the fact-

finder to:

> 'balance between the interests of the [employee], as a citizen, in commenting upon
> matters of public concern and the interest of the State, as an employer, in
> promoting the efficiency of the public services it performs through its employees.'
> *[Pickering,* 391 U.S. at 568; *Connick,* 461 U.S. at 140]. This balancing is
> necessary in order to accommodate the dual role of the public employer as a
> provider of public services and as a government entity operating under the
> constraints of the First Amendment. On the one hand, public employers are
> employers, concerned with the efficient function of their operations; review of
> every personnel decision made by a public employer could, in the long run,
> hamper the performance of public functions. On the other hand, 'the threat of
> dismissal from public employment is . . . a potent means of inhibiting speech.'
> *[Pickering,* 391 U.S. at 574]. Vigilance is necessary to ensure that public
> employers do not use authority over employees to silence discourse, not because it
> hampers public functions but simply because superiors disagree with the content of
> the employee's speech.

*Rahn,* 31 F.3d at 411 (citing *Rankin v. McPherson,* 483 U.S. 378, 384 (1987)).

The individual defendants are entitled to qualified immunity and to summary judgment on

plaintiff's First Amendment claim brought under § 1983.  Plaintiff cannot establish a violation of

his First Amendment rights because he has not shown that he engaged in speech on a matter of

public concern.  Plaintiff's speech regarded alleged harassment of him by his supervisors,

disparate treatment, the denial of a hearing on his poor evaluation, and a failure to follow policies

in connection with his evaluation.  These are matters of purely personal interest to an individual

employee and, as such, do not constitute protected speech.  In addition to these matters, the record

indicates that plaintiff may have also complained on one or two occasions about isolated

management actions that allegedly compromised patient safety.  The incidents described by

plaintiff, however, were not sufficiently widespread or serious as to constitute matters of concern

to the public as opposed to the individual involved.  Thus, because the Court finds as a matter of

law that plaintiff's speech did not touch on a matter of public concern, the individual defendants

are entitled to qualified immunity and to summary judgment on the First Amendment claim

brought under § 1983.

**G.  FMLA claim**

Plaintiff admits that the individual defendants cannot be held liable on his FMLA claim.

With respect to plaintiff's FMLA claim against Summit, the Sixth Circuit has held that private

litigation to enforce the FMLA against a state may not proceed in federal court.  ***Sims v.***

***University of Cincinnati,*** 219 F.3d 559 (6th Cir. 2000).  Subsequent to the decision in ***Sims,*** the

United States Supreme Court held that state employees may recover money damages in federal

court in the event of a state's failure to comply with the FMLA's family-care provision.  ***Nevada***

***Dept. of Human Resources v. Hibbs,*** 538 U.S. 721 (2003).  The Supreme Court did not address

in ***Hibbs*** whether a state employee is barred from recovering money damages in federal court in

the event of a state's failure to comply with the FMLA's self-care provision, which is the FMLA

provision at issue in this case.  Thus, ***Sims*** apparently remains good law in this Circuit with

respect to the self-care provision, so that plaintiff may not seek money damages against Summit

in federal court.  There appears to be no bar to plaintiff's request for injunctive relief against

Summit under the FMLA.  Accordingly, the court will address whether plaintiff has stated a claim

33

for injunctive relief against Summit for an FMLA violation.

Title 29 U.S.C. § 2615(a)(1) states that "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Title 29 U.S.C. § 2612(a)(1)(D) states that ". . . an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

In FMLA cases that rely upon indirect evidence, the three-step *McDonnell Douglas* paradigm applies. See *Skrjanc v. Great Lakes Power Service Co.,* 272 F.3d 309, 314 (6th Cir. 2001). The plaintiff  must first prove a prima facie case. A plaintiff may establish a prima facie case of retaliation under the FMLA by showing that (1) he availed himself of a protected right under the FMLA, (2) defendant was aware of this exercise of protected rights, (3) the defendant took an employment action that was adverse to the plaintiff, and (4) there is a causal connection between the protected activity and the adverse employment decision. *Id.* at 314 (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990)). In order to establish a causal link, the plaintiff must "proffer evidence 'sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.'" *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990) (quoting *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982)). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Skrjanc,* 272 F.3d at 315.  If the defendant articulates such a reason, then the plaintiff has the burden of showing that the articulated reason is a pretext for discrimination. *Id.*

34

Defendant claims that plaintiff has suffered no injury for which the FMLA affords a remedy.  Defendant notes that plaintiff's requests for FMLA leave were granted both before and after a written warning was given to him on September 30, 2002.  In response, plaintiff asserts that Exhibit 88 discloses that he was disciplined for taking time off for his own medical condition under the FMLA, that defendants discouraged plaintiff from taking time off by requiring him to provide medical information beyond that required from other employees in order to continue to be off work, and it is a question of fact whether plaintiff abused his time off by attending a deposition or by demonstrating a pattern of taking time off.

Exhibit 88 is a Letter of Reprimand that plaintiff received for calling in sick under the FMLA on three days prior to a regular day off and for attending a deposition on one of those days.  The Letter of Reprimand lists "Adherence to HR-125" as the "Appropriate behavior expected and/or corrective measures to be taken."  There is no evidence that the Letter of Reprimand resulted in an adverse employment action against plaintiff or in a tangible loss of any sort or that it interfered with the exercise of his rights under the FMLA.  Similarly, the record does not support a finding that defendants' requests for medical verification interfered with plaintiff's taking FMLA leave.  For these reasons, plaintiff has failed to come forward with sufficient evidence to establish a violation of his rights under the FMLA, and Summit is entitled to summary judgment on the claim.

**H. State law claims**

Because the Court has determined that defendants are entitled to summary judgment on plaintiff's federal claims, the Court declines to exercise supplement jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c).

### VII. Conclusion

1) Plaintiff concedes that the individual defendants may not be held personally liable for violations of the ADA, and the individual defendants are therefore entitled to summary judgment on plaintiff's ADA claim.

2) Plaintiff concedes that the individual defendants cannot be held liable under the Rehabilitation Act, and the individual defendants are therefore entitled to summary judgment on the Rehabilitation Act claim.

3) Summit is entitled to summary judgment on plaintiff's ADA Title II claim.

4) Summit is entitled to summary judgment on plaintiff's claim for damages under Title I of the ADA on grounds of sovereign immunity and on plaintiff's claim for injunctive relief under Title I based on plaintiff's failure to show the existence of a genuine issue of material fact.

5) Summit is entitled to summary judgment on plaintiff's hostile environment claim under both the ADA and the Rehabilitation Act.

6) The individual defendants are entitled to qualified immunity and to summary judgment on plaintiff's First Amendment claim under § 1983.

7) Plaintiff concedes that Summit cannot be held liable for damages on his First Amendment claim and he does not seek injunctive relief on that claim, so that Summit is entitled to summary judgment on the First Amendment claim.

8)      Plaintiff concedes that the individual defendants cannot be held liable on his FMLA claim, and the individual defendants are therefore entitled to summary judgment on the FMLA claim.

9)      Summit is entitled to sovereign immunity on plaintiff's claim for damages under the FMLA, and his claim for injunctive relief under the FMLA fails on the merits.

10)     The individual defendants cannot be held personally liable for retaliation under Title VII, and plaintiff has failed to show the existence of a genuine issue of material fact on the claim, so that the defendants are entitled to summary judgment on plaintiff's Title VII retaliation claim.

11)     The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.

        In accordance with the foregoing, defendant's motion for leave to file a supplemental memorandum is **GRANTED.**  Defendants' motion for summary judgment is **GRANTED.** Plaintiff's claims under federal law are **DISMISSED** with prejudice.  Plaintiff's state law claims are **DISMISSED** without prejudice for lack of jurisdiction.  This action is **DISMISSED** and is **TERMINATED** on the docket of the Court at plaintiff's cost.

        **IT IS SO ORDERED.**


                                        S/ Herman J. Weber
                                        _____
                                              HERMAN J. WEBER
                                        SENIOR JUDGE, UNITED STATES DISTRICT COURT


J:\HJWA\02-308disabmsjPUB.wpd